IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TANYA LEWIS,

     Plaintiff,       CV-08-410-ST

  v.           FINDINGS AND
             RECOMMENDATION
WAL-MART STORES, INC., a Delaware
corporation,

      Defendant.     

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Tanya Lewis, filed this action on March 3, 2008, in Multnomah County Circuit

Court, Case No. 0803-03376, alleging that defendant, Wal-Mart Stores Inc. ("Wal-Mart"),

violated ORS 659A.040 by discriminating against her for utilizing Oregon's workers

compensation system. Wal-Mart timely removed the action pursuant to 28 USC § 1441(b) based

on diversity jurisdiction pursuant to 28 USC § 1332. Wal-Mart now moves for summary

judgment. For the reasons that follow, Wal-Mart's motion should be DENIED.

1 - FINDINGS AND RECOMMENDATION

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted). In employment discrimination cases "very little evidence" is required to survive summary judgment "because the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by the factfinder, upon a full record. " *Schnidrig v. Columbia Mach.*, 80 F3d 1406, 1410 (9th Cir) (internal quotations, citation omitted), *cert denied*, 519 US 927 (1996).

///

///

## FACTS

Because all material facts must be viewed in the light most favorable to the non-movant, this court will view the evidence most favorably to Lewis.[1]

### I.      Lewis's Employment and Injury

Lewis began employment with the Wal-Mart in Wood Village, Oregon on August 18, 2005. Lewis Depo., p. 35. She initially worked on the remodel team until September 2005 when she was transferred to work as a Produce Sales Associate. *Id.* She received her first performance evaluation in November 2005, which rated her performance as "Meets Expectations." Skarpac Decl. (docket #39), ¶ 16 & Ex. A. On December 19, 2005, Lewis suffered injuries to her right arm and knee when she fell through a pallet. Lewis Depo., pp. 45-46. Lewis felt that Wal-Mart treated her well up until this point. *Id*, p. 37.

Lewis immediately reported her injury to Risk Manager Camille Mast and Overnight Support Manager Tara Brunkow, who filled out an incident report pursuant to Wal-Mart policy. *Id*, p. 47. Mast told Lewis that her injury appeared to be a bruised bone and told her to clock out, go home, put ice on it, and take the next few days off work. *Id*, pp. 47-49, 51. She also told Lewis to return to the personnel office if it did not get better. *Id*, p. 51.

While Lewis' knee quickly healed, her elbow continued to hurt. *Id*, p. 50. In mid-January 2006 she returned to the personnel office to speak with Mast, but learned that she had left and that Wal-Mart was in the process of replacing her. *Id*, p. 52. As a result, Lewis did not

---

[1] Both parties have submitted documents with various attachments. Citations to declarations and depositions are identified by the last name of the declarant or deponent, and citations are to the paragraph(s) of the declaration or page(s) of the deposition transcript.

report that she continued to suffer pain in her elbow because she "didn't know who to go to after that." *Id*.

Lewis's elbow continued to worsen, and on either February 12 or 14, 2006,[2] Lewis awoke unable to move her arm. *Id*, p. 53. After she reported her continuing pain, Assistant Manager Jim Patterson helped Lewis complete the workers compensation paperwork and told her to seek medical attention. *Id*, pp. 53-54; Skarpac Decl., ¶ 32 & Ex. Q. Up to that point, Lewis had not seen a doctor for her injury. Lewis Depo., p. 48.

Lewis saw a doctor that day who released her to return to work with the restriction of not using her right arm. *Id*, pp. 58-59. Because this restriction did not permit Lewis to return to her position as a Produce Sales Associate, Wal-Mart offered her a People Greeter position which could accommodate her restrictions. *Id*, pp. 59-60. As a People Greeter, Lewis was responsible for greeting customers, checking receipts, monitoring potential security risks, and other miscellaneous light duties within her restrictions. *Id*, p. 60; Skarpac Decl., Ex. B. Lewis held this position until her termination. Lewis Depo., p. 60. Risk Manager Mia Nordin told Lewis upon starting her new position to work within her restrictions and to inform someone in management if she were required to work beyond them. Nordin Decl. (docket #41), ¶ 2.

Over the next few months, Lewis's elbow improved, resulting in her being offered part-time work stocking merchandise in addition to her People Greeter duties. Skarpac Decl., ¶ 2. In June 2006, Lewis received an overall rating of "Meets Expectations" on her annual performance evaluation and a $0.40-per-hour raise. Lewis Depo., pp. 89-90; Skarpac Decl., ¶ 18 & Ex. C.

---

[2] The evidence conflicts as to the date Lewis initially reported her continuing pain. *See* Lewis Depo., pp. 56-58. Documentary evidence indicates Lewis reported it on February 12, while Lewis stated at times that she thought the date was February 14 when the records indicate she began treatment for her injury. *Id*.

However, she was rated "Below Expectations" on her attendance. Lewis Depo., pp. 90-91. Lewis disagreed verbally with this portion of the evaluation, but made no note in the "Associate Comments" section. *Id*.

In July 2006, Lewis's doctor released her to return to work without restrictions other than not performing her original produce position. *Id*, pp. 96-97. She continued to work as a People Greeter and perform stocking duties and was generally happy except that she felt the People Greeter duty was boring. *Id*, pp. 98-99.

A few weeks later, Lewis's elbow began hurting again. *Id*, pp. 100-101. She informed management and returned to her doctor who put her back on light duty and restricted her to no repetitive use of her right arm and no lifting over seven pounds with her arm. *Id*, pp. 102-03; Sails Decl. (docket #40), ¶ 4 & Ex. B. Her doctor also reinstated her therapy and pain and anti-inflammatory medications. Lewis Depo., p. 102.

Lewis was released to regular duty in October 2006, but returned to her doctor in December 2006 after again experiencing pain within weeks of the release. *Id*, pp. 115-16; Sails Decl., ¶ 5 & Ex. C. Her doctor took her off work for several days and imposed further restrictions upon her return, including working with a sling on her right arm, minimal use of her right hand, no repetitive duties, and no pushing or pulling with her right arm. Lewis Depo., p. 120; Sails Decl., ¶ 6 & Ex. D.

Wal-Mart's workers compensation insurance carrier asked Lewis to attend an independent medical examination ("IME") in January 2007. Lewis Depo., p. 122. The IME physician concluded that Lewis's elbow condition required surgery. *Id*, pp. 122-23. Wal-Mart

5 - FINDINGS AND RECOMMENDATION

granted Lewis a leave of absence from February 16 through March 26, 2007, for the surgery and

recovery. *Id*, pp. 123-24; Fjelstad Decl. (docket #56), ¶ 10 & Ex. I.

Lewis returned to work around March 16, 2007. Lewis Depo., p. 129. She continued

working as a People Greeter and performed other duties as assigned by her supervisor until Wal-

Mart terminated her on April 7, 2007. *Id*, pp. 131-32.

## II.    Discipline and Termination

Wal-Mart's disciplinary policy ("Coaching for Improvement") is a four-level process.

Skarpac Decl., ¶¶ 4, 20 & Ex. E. The first two levels are a documented Verbal Coaching and a

Written Coaching, which inform the employee ("Associate" in Wal-Mart parlance) that she is

not meeting expectations and set forth how to correct the behavior. *Id*. The third level is the

Decision-Making Day Coaching, which describes the Associate's misconduct and provides a

paid day off work for the Associate to develop a plan to improve that conduct. *Id*. Failure to

improve or additional behavior warranting discipline results in the final level of termination. *Id*.

Depending on the severity of an Associate's conduct, Wal-Mart may skip any one of these

levels. *Id*. Discipline for further misconduct automatically moves to the next coaching level if it

is committed within one year of the previous misconduct. *Id*. Lewis knew of and understood

this policy. Lewis Depo., pp. 33-35.

### A.    Verbal Coaching for Failing to Perform Her Job

On December 30, 2005, 11 days after her injury, Lewis received a Verbal Coaching for

not completing two jobs requiring her to fill fruit bins. *Id*, pp. 40-43; Skarpac Decl., ¶ 23 &

Ex. H. Lewis protested that she was not at fault, but lacked fruit to fill the bins. Lewis Depo.,

pp. 40-41. Her manager rejected her explanation and recorded the coaching in her file, though

Lewis was not aware that this was considered a formal coaching until several months later when she received her next coaching.  *Id*, p. 42.

### B.    Written Coaching for Violating Break and Meal Policy

On April 9, 2006, Lewis received a Written Coaching for violating Wal-Mart's break and meal policy.  *Id*, pp. 64-65; Skarpac Decl., ¶ 22 & Ex. G.  This policy provides Associates with rest and meal breaks in accordance with state and federal laws and requires disciplinary action for missing breaks or taking breaks that are too long, too short, or untimely.  Skarpac Decl., ¶¶ 5, 21 & Ex. F.  It allows no exceptions in states such as Oregon with statutory break and meal requirements.  *Id*.  Lewis was trained on this policy upon her initial employment with Wal-Mart.  *Id*, ¶ 6.

Brunkow, now an Assistant Manager, gave Lewis the Written Coaching because she failed to take her meal break between the third and fifth hours of her shift beginning April 1, 2006, as required by Oregon law.  *Id*., ¶ 22 & Ex. G; Brunkow Decl. (docket #47), ¶ 2.  Lewis felt this coaching was unjust and discriminatory.  Lewis Depo., pp. 64-65.  She believed she had permission to take her meal break when she did and only missed the three to five hour window because Daylight Savings Time moved the clock forward one hour during her shift that night.  *Id*, pp. 63-64.

### C.    Decision-Making Day Coaching for Violating Attendance Policy

Lewis received her third coaching, or Decision-Making Day Coaching, in June 2006 for violating Wal-Mart's Attendance Policy.  *Id*, p. 79; Brunkow Decl., ¶ 3; Skarpac Decl., ¶ 26 & Ex. K.  Pursuant to its Attendance Policy, Wal-Mart tracks all active attendance exceptions for a rolling six-month period.  Skarpac Decl., ¶¶ 8, 25 & Ex. J.  Associates are allowed a maximum

of three unexcused absences during that period and are subject to disciplinary action upon accruing a fourth unexcused absence. *Id*. The policy ordinarily proceeds up the disciplinary process for each additional absence (*e.g.*, Verbal Coaching for the fourth, Written Coaching for the fifth, *etc*.). *Id*. An Associate with six or more unexcused absences in any rolling six-month period is subject to immediate termination. *Id*. This policy is intended to be rigidly enforced. Adcock Depo. (Fjelstad Decl., Ex. C), pp. 26-27; Skarpac Depo. (Fjelstad Decl., Ex. E), pp. 25-26; Brunkow Depo. (Fjelstad Decl., Ex. G), pp. 25, 27-28. The Attendance Policy provides that managers should verbally advise an Associate when unapproved absences and tardies occur, even before advancing to the formal Coaching for Improvement process. Skarpac Decl., Ex. J, p. 3 (Bates No. 1000327).

Assistant Managers are charged with tracking each Associate's absenteeism record. Anderson Depo. (Fjelstad Decl., Ex. B), p. 66. Wal-Mart uses a computer system for tracking these records which alerts Assistant Managers when an Associate violates the Attendance Policy. *Id*, p. 65. Assistant managers are also in charge of coding an Associate's absence in the computer system as "approved" or "excused." *Id*, pp. 56, 58; Adcock Depo., p. 17. The evidence conflicts as to whether a manager can change the coding of an absence after it has been entered. *Compare* Anderson Depo., pp. 60-61 (managers *can* change the coding) with Adcock Depo., p. 20 (managers *cannot* change the coding).

While she was on the overnight shift, Lewis was supervised by two Assistant Managers: Jeffery Hollinshead and Brittany Anderson. According to Anderson, Hollinshead had more direct supervisory authority over Lewis as he was actually "coded" to have supervisory responsibility over People Greeters. Anderson Depo., p. 33. Hollinshead had access to the

computer system and kept track of his Associates' attendance "every day" he worked.

Hollinshead Depo. (Fjelstad Decl., Ex. D), p. 55; *see also* Adcock Depo., pp. 11-12.

On June 7, 2006, Brunkow disciplined Lewis for accumulating her seventh unexcused absence. Lewis Depo., p. 79; Brunkow Decl., ¶ 3; Skarpac Decl., ¶¶ 9, 26 & Ex. K. Lewis complained that she was unaware that she had accrued so many unexcused absences and had not been warned about excessive absenteeism. Lewis Depo., p. 79; Skarpac Decl., Ex. K. Lewis received this coaching after she demanded her attendance sheet due to her belief that Wal-Mart was charging her with too many unexcused absences because of scheduling changes and absences related to her daughter's recent illness. Lewis Depo., pp. 79-82.[3] When she asked for her attendance sheet, Hollinshead refused to provide it and said that he now had "no choice but to coach [her] now." *Id*, p. 80. Lewis perceived this action as discriminatory though she did not deny that it was possible she had accumulated seven unexcused absences at the time of this coaching. *Id*, p. 85. Wal-Mart has no explanation for why Lewis was permitted to accumulate so many absences before being disciplined or was not automatically terminated pursuant to its Attendance Policy upon accumulating her seventh unexcused absence. Skarpac Depo., p. 25.

According to Wal-Mart's records, Lewis accumulated three additional unexcused absences over the next two weeks in June 2006, for a total of 10 in one six-month period. Skarpac Decl., ¶ 27 & Ex L. Nevertheless, Lewis received no further discipline for violations of the Attendance Policy until her termination.

///

///

---

[3] This is a charitable, although not unreasonable, interpretation of these confusing pages of Lewis's deposition.

**D.**     <u>**Termination for Violating Attendance Policy**</u>

On April 7, 2007, Wal-Mart terminated Lewis for again violating its Attendance Policy. Lewis Depo., p. 132; Skarpac Decl., ¶ 11.  Hollinshead alone made the decision to terminate her. Skarpac Decl., ¶ 11; Hollinshead Depo., p. 89.  Despite testifying that he checked his attendance tracking every day, Hollinshead could not recall when he discovered that Lewis had an excessive number of absences.[4]  Hollinshead Depo., p. 85.  At the time of his deposition he also could not explain why he waited until April to terminate Lewis when her attendance sheet showed that she had accumulated her seventh absence by January 15, 2007, except to state that he goes by "policy and procedure."  *Id*, p. 88.  However, in response to Lewis's opposition to Wal-Mart's summary judgment motion, Hollinshead somehow managed to recall that Lewis accumulated additional unexcused absences upon returning to work after her surgery.  Hollinshead Decl. (docket #52), ¶ 2.  Due to the fact that her shifts had not yet been entered into Wal-Mart's computerized schedule, these absences were recorded on a "redlined" hard-copy of the schedule.[5]  *Id*.

Lewis did not know she was being terminated for absenteeism, and Hollinshead only told her that Wal-Mart "no longer had a position for her."  Lewis Depo., p. 133.  She left without signing the exit interview papers which indicated "Excessive Absences and/or Tardies" as the reason for termination.  *Id*, pp. 133-34; Fjelstad Decl., ¶ 12, Ex. K, p.1.  Lewis maintains that after December 1, 2006, she never missed work except to care for her significant other for which

---

[4] At his deposition, Hollinshead responded to most of the  questions with "I cannot recall" or some variation thereof.

[5] Comparing the "redlined" schedule to the "Approved Non-Scheduled Worked Shifts" section of the attendance report, Lewis was allegedly absent March 23, March 27, and April 6, such that she accrued 10 unapproved absences in the previous six months.  However, the evidence as to these absences was stricken due to a lack of foundation (docket #63).

she received verbal approval or to take leave authorized by her workers compensation claim.

Lewis Depo., pp. 138-39.

### III.    Violations of Work Restrictions

Apart from the three steps of formal discipline received after the filing of the workers compensation claim, Lewis identifies several other actions by Wal-Mart that she perceives as discrimination for invoking the workers compensation system.  One of the primary problems she encountered was management's persistent requests that she perform work outside of her medical restrictions.  Hollinshead began asking her to perform duties beyond her medical restrictions shortly after she first received these restrictions in March 2006.  *Id*, pp. 61-62.  These duties included moving carts, moving ice, and facing and rotating bakery merchandise.  *Id*.  She worked around her restrictions by using her left arm to perform most of these duties.  *Id*.  At some point approximately around the time of her Decision-Making Day Coaching, she complained about being assigned duties beyond her restrictions to which Hollinshead responded, "he was not losing his job because of [her]."  *Id*, p. 88.

After she again was put on work restrictions in August 2006, Hollinshead again requested that she perform stocking duties beyond these restrictions, despite having been informed about them.  *Id*, pp. 103-05.  On one occasion, Lewis told Hollinshead she was unable to perform the requested duties, and he responded by walking away without saying anything.  *Id*, pp. 105-06.  Believing he still expected her to perform these duties, she was able to complete them by enlisting the help of coworkers.  *Id*, p. 106.

In September 2006, Lewis complained to Risk Manager Tasha Sails that she felt Hollinshead was requiring her to perform work outside of her restrictions.  *Id*, p. 107.  At this

time, she first complained that she felt she was being discriminated against. *Id*, p. 78. Sails

assured Lewis that she would write a note to the night managers (which included Hollinshead)

reminding them of her work restrictions, and did so. *Id*, p. 108; Sails Decl., ¶ 2. Sails also spoke

with Crawford and the other Co-Manager, Rick Skarpac, about these issues but does not

remember what, if anything, they did at that time. Sails Depo. (Fjelstad Decl., Ex. F), pp. 23-

24.[6] Despite Sails's efforts, Hollinshead continued to assign Lewis duties beyond her restrictions

about three days a week. Lewis Depo., p. 111. Because Lewis continued to experience

problems with Hollinshead, she approached store Co-Manager Paul Crawford in October 2006.

*Id*.

      In addition to Hollinshead's assignments, sometime between September 2006 and April

2007, Anderson also asked Lewis to work outside of her restrictions by asking her to stock the

infants section. *Id*, pp. 113-15. After Lewis informed Anderson she could not work in this area,

Anderson sent her to a different section. *Id*. Lewis perceived this section also to fall outside her

restrictions, but did not complain and instead chose not to stock about 90% of the merchandise.

*Id*.

      In December 2006, Store Manager David Fuller approached Skarpac and informed him

that Lewis was seeking the advice of an attorney for being asked to work outside her restrictions.

Skarpac Depo., p. 10. Skarpac then sent an email to Lewis's supervisors, carefully instructing

them regarding what limited duties Lewis was to perform. *Id*; Skarpac Decl., ¶ 19, Ex. D. After

_____

      [6]  Sails also recalls informing Lewis's managers of additional restrictions Lewis received in November 2006. Sails Depo., pp. 19-20. These restrictions are not in the record. According to the evidence submitted by both parties, Lewis was given a full release back to work on October 30, 2006, and then put back on light duty with restrictions on December 13, 2006. Sails Decl., ¶¶ 5-6 & Exs. C-D.

this email, Hollinshead's treatment of Lewis worsened, and he started asking her to do more duties in violation of her restrictions.  Lewis Depo., pp. 121-22.

Hollinshead continued assigning Lewis stocking-related "soft lines" duties when she returned from surgery in March 2007, but Lewis figured out a way to perform these duties without using her injured arm.  *Id*, pp. 130-31.  About a week before she was terminated, Lewis complained about her job duties to Skarpac who told her to come to him if there were any further problems.  *Id*, p. 110.

When asked about his interactions with Lewis, Hollinshead testified that he could not recall ever discussing Lewis's restrictions with her, whether he ever asked her to work beyond her restrictions and, in fact, whether he ever assigned her tasks while he was her manager. Hollinshead Depo., pp. 51, 80, 94.  He did remember receiving notice of restrictions related to her workers compensation claim though he could not recall how many times.  *Id*, p. 34.

Despite the onset of these actions shortly after her doctor first imposed restrictions on her, Lewis admits that she did not complain to management about this behavior until September 2006.  Lewis Depo., p. 78.  She also admits that she was never disciplined for refusing to or being unable to complete any job duties which were assigned to her.  *Id*, pp. 111-112.  She cannot recall ever being treated negatively because she was unable to perform a part of an assignment that was beyond her restrictions.  *Id*, pp. 106-07.

**IV.    Reduced Pay and Demand Letter**

Lewis also complains about a reduction in pay received shortly after becoming a People Greeter.  In April or May 2006, Lewis had her pay reduced about $1.00 per hour.  *Id*, pp. 71-72. Wal-Mart was unaware of this problem until Lewis's attorney sent a demand letter on

December 19, 2006, requesting that the pay reduction be rectified.[7]  Skarpac Depo., pp. 19-21;

Skarpac Reply Decl. (docket #53), ¶3; Fjelstad Decl.,¶ 11 & Ex. J; Fuller Decl. (docket #42), ¶ 4

& Ex. A.  The demand letter also complained that Lewis was being forced to work beyond her

restrictions in what she perceived to be an effort to get her to quit, and that she was being denied

the opportunity to return to her former job in the produce section.  Fjelstad Decl., Ex. J, p. 1.

Accordingly, Lewis offered to release Wal-Mart of all potential claims if it would return her to

her old position, reinstate her old wage rate, and remove a coaching from her record.  *Id*, p. 2.

Lewis later clarified that she never intended to be restored to her old position in produce, but

merely wanted her wages returned to the appropriate level.  Lewis Depo., pp. 125-26.

By letter dated February 2, 2007, Wal-Mart reported that it had investigated the wage

matter and determined that several errors in job coding had caused the error, rather than any

intentional act by management.  Fuller Decl., ¶ 5 & Ex. B., p. 2.  Wal-Mart indicated it would

reimburse Lewis for the error and did so.  *Id*; Skarpac Reply Decl., ¶ 3.  Wal-Mart also

determined that Lewis had been properly disciplined on April 9 and June 7, 2006, and refused to

return her to the produce position because her medical restrictions precluded the essential

functions of the job.  Fuller Decl., ¶ 5 & Ex. B, p. 3.

///

///

///

///

---

[7] Lewis testified that she notified an assistant manger named "Gary" about her pay reduction and that he said her pay had been reduced because she "was getting paid too much to stand at the door."  Lewis Depo., p. 72.

## FINDINGS

### I.    Burden-Shifting Framework

Lewis asserts a single claim of unlawful discrimination for utilizing the Oregon workers compensation system pursuant to ORS 659A.040 which makes it:

> an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized the procedures provided for in ORS chapter 656 or has given testimony under the provisions of those laws.

Specifically, Lewis asserts that she was disciplined in April and June 2006 and terminated in April 2007 because she filed a workers compensation claim in February 2006.

This court applies the *McDonnell Douglas* burden-shifting framework to claims of employment discrimination arising under state law. *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F3d 1080, 1092 (9th Cir 2001) (holding that *McDonnell Douglas* framework applies to discrimination under Oregon disability discrimination law); *Scott v. Sears, Roebuck & Co.* 395 F Supp2d 961, 981 (D Or 2005) (applying *McDonnell Douglas* to discrimination claim under ORS 659A.040); *Dickison v. Wal-Mart Stores, Inc.*, Civil No. 06-108-AA, 2007 WL 1959287 (D Or July 2, 2007) (same).

Under the *McDonnell-Douglas* framework, the plaintiff establishes a *prima facie* case by presenting sufficient admissible evidence to raise an inference that discrimination occurred. *McDonnell Douglas Corp. v. Green*, 411 US 792, 802-04 (1973); *Snead*, 237 F3d at 1089.  Once plaintiff has established a *prima facie* case, the burden switches to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action.  *McDonnell Douglas*, 411 US at 802-04.  If the defendant produces a legitimate reason, the burden returns to the plaintiff to show

by a preponderance of the evidence that the alleged legitimate, nondiscriminatory reason for the

employment action is actually pretext for discrimination.  *Id*.

## II.    *Prima Facie* **Case**

### A.    **Legal Standards**

To establish a *prima facie* case of workers compensation discrimination pursuant to

ORS 659A.040, Lewis must adduce evidence that she: (1) invoked the workers compensation

system; (2) was discriminated against in the tenure, terms, or conditions of employment; and

(3) was discriminated against because she invoked the workers compensation system.  *Williams*

*v. Freightliner, LLC*, 196 Or App 83, 90, 100 P3d 1117, 1121 (2004).  The parties agree that

Lewis has satisfied the first two elements based on her workers compensation claim in February

2006 and her termination in April 2007.

### B.    *Prima Facie* **Case**

#### 1.    **Adverse Employment Actions**

The parties agree that Lewis's termination was an adverse employment action.  It is

possible that Lewis's Written and Decision-Making Day Coachings also constitute adverse

employment actions for purposes of ORS 659A.040, but Lewis clarified at oral argument that

she is seeking damages only for her termination.  She considers these disciplinary actions along

with the other adverse actions taken by Wal-Mart only as evidence of its discriminatory intent in

terminating her.

///

///

///

16 - FINDINGS AND RECOMMENDATION

2.    **Causation**

In order to establish the causal link, Lewis must show that her workers compensation claim was a "substantial factor," or "a factor that made a difference," in Wal-Mart's decision to terminate her.   *Estes v. Lewis and Clark Coll.*, 152 Or App 372, 381, 954 P2d 792, 797 (1998) (citations omitted).  Proof needed to defeat summary judgment at the *prima facie* level "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F3d 885, 889 (9th Cir 1994) (citation omitted).  This court concludes that Lewis has presented sufficient evidence to meet this minimal burden.

In Lewis's view, life at Wal-Mart was fine until she suffered her on-the-job injury and filed a workers compensation claim.  Within weeks of filing her claim, taking time off, and being placed on work restrictions, she suffered discipline for violating Wal-mart's rest and meal policy.   She was disciplined despite the fact that Daylight Savings Time had shortened the "safe zone" for her to take the break and despite receiving approval from one of her supervisors to take her lunch when she did.   Around this same time, her pay was reduced and she began incurring hostile treatment at the hands of Hollinshead who repeatedly assigned her work outside of her work restrictions.

The discriminatory activity continued with her third step of discipline, the Decision-Making Day Coaching, only four months after Lewis filed her workers compensation claim. Hollinshead instigated this discipline after Lewis demanded to look at her time sheet to make sure her time was recorded appropriately.

Lewis identifies Hollinshead as her primary antagonist from that point forward.  There is no dispute that Hollinshead was aware that Lewis had work restrictions attendant to her workers

compensation claim.  Lewis believes Hollinshead resented her work restrictions which prevented

him from assigning her duties as he saw fit.  This mistreatment continued throughout the

duration of her employment, recurring each time she was assigned a new set of restrictions.

After she complained on one occasion around the time of her Decision-Making Day Coaching,

he told her menacingly that "he was not losing his job because of [her]."  Lewis Depo., p. 88.

Lewis viewed Hollinshead's behavior, along with her pay reduction and discipline, as an effort

to force her to quit after she filed her workers compensation claim.  Despite her renewed

complaints in September 2006, he continued to assign duties that were beyond her restrictions at

least three times a week.  Hollinshead was unable to either confirm or deny whether he ever

assigned Lewis work outside her restrictions.

Finally, Hollinshead terminated Lewis approximately three weeks after she returned from

surgery on her arm with severe work restrictions.  Prior to firing her, Hollinshead had again

assigned her duties which Lewis believed exceeded her restrictions.

Wal-Mart attacks this evidence as insufficient to show that any adverse employment

action was motivated by the workers compensation claim.  With respect to timing, it argues that

the 14-month period between Lewis's workers compensation claim and her termination is far too

long to raise an inference of discrimination.

It is well-established in the Ninth Circuit that "[c]ausation sufficient to establish the third

element of the prima facie case may be inferred from circumstantial evidence, such as the

employer's knowledge that the plaintiff engaged in protected activities and the proximity in time

between the protected action and the allegedly retaliatory employment decision."  *Yartzoff v.

Thomas*, 809 F2d 1371, 1376 (9th Cir 1987), *cert denied* 498 US 939 (1990).  The Ninth Circuit

has further cautioned that "a specified time period cannot be a mechanically applied criterion." *Coszalter v. City of Salem*, 320 F3d 968, 977 (9th Cir 2003) (noting that time periods of three to 11 months has been found sufficient to support an inference of discrimination).

Wal-Mart cites a number of cases from this district which have addressed similar claims and concluded that even very short time periods were insufficient to establish a causal link. *See Barnes v. G.E. Sec., Inc.*, Civil No. 06-1632-AA, 2008 WL 1848131, *3 (D Or April 22, 2008) (plaintiff failed to establish causation for her termination 10 months after filing a workers compensation claim where she was fired for a clear violation of her employer's attendance policy and admitted the person who made the decision to terminate her had never treated her poorly), *aff'd*, 2009 WL 1974770 (9th Cir June 18, 2009) (unpublished opinion); *Lucas v. Lake County*, Civil No. 06-3046-PA, 2007 WL 1413001, *5 (D Or May 7, 2007) (plaintiff failed to establishe causation for his termination only one month after filing a workers compensation claim where all other evidence showed that until he was fired for dishonesty, he and his manager got along well); *Gallagher-Burnett v. Merle West Med. Ctr., Inc.*, Civil No. 03-3051-CO, 2004 WL 2486259, *7-8 (D Or Nov. 4, 2004) (plaintiff failed to establish causation for her termination only a few weeks after filing a workers compensation claim where she was fired for failing to follow a strictly enforced call-in policy for missing shifts). While elements of these cases are similar to this case, each is distinguishable on its facts. Here, as discussed below, Lewis has submitted evidence that Wal-Mart did not enforce its attendance policy strictly. Furthermore, Lewis and her supervisor did not get along, and his repeated assignments of work beyond her restrictions reveal that he may have harbored hostility toward Lewis. Because of these differing facts, the cases cited by Wal-Mart are not particularly persuasive.

Also, this court is not convinced that timing must be measured from the date that Lewis filed her workers compensation claim in February 2007. Lewis continued to have activity on her claim throughout the next 14-months. During that time period, she alternated being on and off restrictions, and ultimately required surgery to repair her elbow just two months before she was terminated. Her termination followed the surgery and a new set of work restrictions. In these circumstances, the timing of her claim, plus the continued hostile treatment by Hollinshead, suffice to raise an inference of discrimination. *See Kirkwood v. W. Hwy. Oil Co.*, 204 Or App 287, 294, 129 P3d 726, 729 (2006) (finding the timing of termination supported plaintiff's *prima facie* case although three years had passed since the filing of the claim and 10 months had passed since the claim was closed where other indicia of discriminatory intent were also present); *see also*, OAR 839-006-0105 ("'Invoke,' as used in ORS 659A.040, includes, *but is not limited to*, a worker's reporting of an on-the job injury or the perception by the employer that the worker had been injured on the job or will report an injury) (emphasis added).

In any event, Lewis has shown more than mere timing. She asserts a persistent pattern of mistreatment after filing her workers compensation claim. Each disciplinary action, including her termination, followed on the heels of activity in her pending workers compensation claim. Her termination occurred within weeks of returning back to work after an extended leave of absence for surgery related to her claim, and her termination occurred before her workers compensation claim was closed.

As to the requests that she work beyond her work restrictions, Wal-Mart points out that Lewis did not complain about this issue until September 2006 when it promptly addressed the issue. It also cites *Fratarcangeli v. United Parcel Serv.*, Civil No. 04-2812-T-TGW, 2008 WL

821946, *18 (MD Fla March 26, 2008), which held, in part, that "a direction to carry out work in excess of restrictions does not, without more, indicate a retaliatory animus," but "[r]ather, the natural inference that flows from such an order is that the supervisor(s) desired the work to get done."  Whatever the merits of that reasoning, a reasonable juror could draw an inference of discrimination where a supervisor repeatedly instructs an employee to perform work in excess of her restrictions, the employee on occasion notifies the supervisor that it is beyond her restrictions or simply refuses to perform the work, and the same supervisor disciplines and terminates her. *See*, *e.g.*, *Kotelnikov v. Portland Habilitation Ctr.,* 545 F Supp2d 1137, 1140 (D Or 2008) (finding genuine issue of material fact precluded summary judgment where employer assigned employee duties above his work restriction after his return from time off for his injury and later terminated him); *Williams*, 196 Or App at 92, 100 P3d at 1122 (finding that asking the plaintiff to work outside his work restrictions was one factor the jury could consider in concluding that his workers compensation claim was the motivating force behind his termination, not his insubordination).

Certainly one permissible inference, as Wal-Mart argues, is that Hollinshead wanted to get the job done.  However, another reasonable inference, as Lewis argues, is that Hollinshead resented the fact that the she was on medical restrictions and tried to force her to quit.  Wal-Mart's prompt action had little effect on Hollinshead's behavior.  That Lewis did not complain until September 2006 is of little moment.  When an employee suffers what she perceives to be discriminatory conduct, the credibility of her later complaints is not reduced when that conduct has become more than she can bear.

Taken together, these facts distinguish this case from those cited by Wal-mart and suffice to establish a *prima facie* case. Wal-Mart's reading of the facts is not unreasonable, and a jury could ultimately find in its favor. At this stage, however, the court must look at all facts in the light most favorable to plaintiff. In this light, Lewis has raised a triable issue of fact as to causation. *See, e.g.*, *Kirkwood*, 204 Or App at 294, 129 P3d at 729 ("Although defendant's evidence would also permit a jury to draw a reasonable inference to the contrary, the conflicts in the evidence do not entitle defendant to judgment as a matter of law.")

### C.  **Legitimate Justification**

The burden now switches to Wal-Mart to articulate a legitimate nondiscriminatory justification for its decision to terminate Lewis. This is merely a burden of production, not a burden of persuasion. *Chuang v. Univ. of Cal.*, 225 F3d 1115, 1123-24 (9th Cir 2000). Wal-Mart has met this burden by explaining that it fired Lewis for violating its attendance policy.

### D.  **Pretext**

Once Wal-Mart asserts a legitimate justification for its employment action, the inference of discrimination drops out of the picture, and Lewis must show that Wal-Mart's justification is mere pretext, and that its real motivation was discriminatory animus. She may do this either through direct or circumstantial evidence. *Coghlan v. Am. Seafoods Co. LLC*, 413 F3d 1090, 1094-95 (9th Cir 2005). As in many employment discrimination claims, Lewis presents no direct evidence that Wal-Mart's actions were motivated by her workers compensation claim. *Cf. Lansford v. Georgetown Manor, Inc.*, 192 Or App 261, 276, 84 P3d 1105, 1115, *adhered to as modified on reconsideration*, 193 Or App 59, 88 P3d 305, *rev denied*, 337 Or 182 (2004) ("The intent to practice. . . discrimination exists in the mind of the person practicing it and,

unless it is an openly declared policy, is apt to be difficult to prove. . . .  An inference drawn

from the conduct giving rise to the particular charge or cause of action may be the only proof

available.") (ellipses in original), quoting *McCuller v. Gaudry*, 59 Or App 13, 17, 650 P2d 148,

150-51 (1982).

Where, as here, an employee relies solely on circumstantial evidence, she may show

pretext "'either directly by persuading the court that a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence.'"  *Chuang*, 225 F3d at 1124, quoting *Texas Dep't of Cmty. Affairs v.*

*Burdine*, 450 US 248, 256 (1981).  This evidence may consist of the same evidence adduced to

establish her *prima facie* case if it is sufficient to raise a genuine issue of material fact regarding

the believability of Wal-Mart's proffered justification.  *Id* at 1127.  However, the evidence of

pretext must be "'specific' and 'substantial' in order to create a triable issue" with respect to an

employer's discriminatory intent.  *Godwin v. Hunt Wesson, Inc.*, 150 F3d 1217, 1222 (9th Cir

1998) (citations omitted); *Stegall v. Citadel Broadcasting Co.*, 350 F3d 1061, 1066 (9th Cir 2003)

(same).

Lewis submits that the facts submitted in support of her *prima facie* case alone are

sufficient to raise a genuine issue of fact regarding the truth of Wal-Mart's proffered reasons.  In

particular, she points to the timing of her discipline and termination coupled with Hollinshead

repeatedly assigning her duties beyond her restrictions.  The court in *Kotelnikov*, 545 F Supp2d

at 1140, found similar evidence sufficient to establish both a *prima facie* case and support a

finding of pretext.  However, this court need not make a similar finding as Lewis also points to

inconsistencies in Wal-Mart's application of its attendance policies that cast doubt on its explanation that Hollinshead was merely following its rigid policies.

First, Wal-Mart admits, and cannot explain why, it failed to discipline Lewis in accordance with its Attendance Policy. Wal-Mart never gave her the verbal warnings required by the policy to let her know she had accrued too many unexcused absences prior to her June 2006 Decision-Making Day Coaching and 2007 termination. Rather, she was forced to ask for her schedule to verify her unexcused absences, and when she did, Hollinshead responded by telling her he now had "no choice" but to discipline her. Lewis Depo., p. 80. Wal-Mart did not terminate her in July 2006 when she had allegedly amassed 10 unexcused absences and waited approximately three months to terminate her when she had again accumulated seven absences the next year.

With respect to her termination, Lewis has submitted comparator evidence of five other Associates supervised by Hollinshead who accrued more than the maximum number of seven unexcused absences and yet were not terminated upon accruing another. Fjelstad Decl., ¶ 13 & Ex. L. Lewis asserts that this evidence shows that Wal-Mart's Attendance Policy was not rigorously enforced and raises the possibility that she was terminated for some other reason.

Wal-Mart counters this evidence with additional testimony by Hollinshead explaining that these Associates were transferred to him with already high levels of absenteeism and that on their next unexceused absence, he decided to coach them first to give them a chance to rectify their behavior. Hollinshead Reply Decl., ¶ 3. Ironically, this explanation proves Lewis's point that Wal-Mart's Attendance Policy allowed for discretion in its administration. In view of this evidence, it is entirely possible that Hollinshead could capriciously enforce Wal-Mart's

Attendance Policy to eliminate an undesirable employee. This reading of the evidence is further supported by Lewis's claim that when Hollinshead terminated her, he did not mention that it was for excessive absenteeism, but instead told her that Wal-Mart "no longer had a position for her." Lewis Depo., p. 133.

Wal-Mart cites other evidence in the record countering this possibility. For example, it argues that had Hollinshead really wanted to eliminate Lewis, he could just as easily have terminated her in July 2006 when she had accumulated 10 unexcused absences. While this may be true, Hollinshead's failure to terminate her at an earlier time does not necessarily preclude the possibility that her discipline and termination were motivated by her workers compensation claim.

In addition, other areas of uncertainty surround Lewis's use of sick and medical leave which make it unclear whether Lewis had, in fact, accumulated the high number of absences of which she was accused both in June 2006 and April 2007. At her Decision-Making Day Coaching, Lewis expressed surprise that she had accumulated so many unexcused absences. Lewis Depo., p. 79; Skarpac Decl., Ex. K. While Lewis did not deny that it was possible she had accumulated seven unexcused absences, some evidence in the record shows that Wal-Mart may have counted excused absences against her. For example, one of her allegedly unexcused absences occurred on December 21, 2005. Lewis Depo., p. 82. This was only two days after she had fallen and injured her elbow at which time a Wal-Mart manager had told her to take a couple days off of work. *Id*, pp. 47. Wal-Mart recorded another unexcused absence on February 13, 2006, the day after she filed her workers compensation claim, and was again told to "take the next couple days off." *Id*, p. 59. Lewis also believes that some of the unexcused absences

recorded closer to her June 2006 coaching were related to approved absences she had taken to care for her daughter or possibly related to scheduling changes that had not been recorded in Wal-Mart's computer system yet. *Id*, pp. 80-82.

Similar discrepancies can be found for the absences which Wal-Mart claims led to her termination. Lewis had an aggravation of the pain in her elbow in early December 2006 which forced her to again seek medical attention. Her doctor took her off work on December 8 and 10-12, 2006. It appears, however, that Wal-Mart recorded unapproved absences for her on December 10 and 11 in spite of this medical release. Skarpac Decl., ¶ 29, Ex. N., p. 2 (Bates No. 1000347). Finally, Lewis claims that she was never absent after December 1, 2006, except as approved for her workers compensation claim or to care for her significant other. Lewis Depo., pp. 138-39. She maintains that Skarpac gave her verbal approval to take this leave although she did not comply with Wal-Mart's Leave of Absence policy by submitting a formal request for leave.

Hollinshead was in charge of recording her absences as excused or unexcused and may have had the ability to change how an absence was coded. Despite claiming he checked his attendance records daily, he violated company policy by failing to warn Lewis of attendance problems and by failing to terminate her and other Associates immediately upon accruing seven absences, but exercised discretion as to which employees he would terminate. Conceivably, he may have coded some excused absences as unexcused in order to terminate Lewis. Viewing this evidence in the light most favorable to Lewis, Wal-Mart's asserted justification for terminating Lewis lacks credence.

///

26 - FINDINGS AND RECOMMENDATION

## RECOMMENDATION

Because genuine issues of material fact exist as to whether Lewis's utilization of Oregon's workers compensation system was a substantial factor in Wal-Mart's decision to terminate her and whether Wal-Mart's proffered justification was a pretext for unlawful discrimination, Wal-Mart's motion for summary judgment (docket #36) should be DENIED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due September 8, 2009.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 20th day of August 2009.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge